UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | *Criminal No. 05-69-P-H* |
| | ) | |
| JONATHAN POLAND, | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTIONS TO SUPPRESS*

Jonathan Poland, charged with one count of knowingly possessing an unregistered destructive device (a pipe bomb) in violation of 26 U.S.C. §§ 5861(d), 5841, 5845(f) and 5871 and one count of maliciously damaging or destroying, or attempting to damage or destroy, personal property by means of an explosive, in violation of 18 U.S.C. §§ 844(i) and 2, seeks to suppress statements made and tangible evidence seized on or about April 3, 2004. *See* Indictment (Docket No. 18); Motion To Suppress Evidence (Docket No. 31); Motion To Suppress Statements (Docket No. 32). An evidentiary hearing was held before me on January 11, 2006 at which the defendant appeared with counsel. Counsel for both parties declined an opportunity to argue orally at the conclusion of the hearing. I now recommend that the following findings of fact be adopted and that both motions be denied.

## **I. Proposed Findings of Fact**[1]

On March 20, 2004 MSP Trooper Paquette was called upon to investigate a complaint that a soda machine had been blown up at Murray's Truck Stop on Auburn Road (Route 4) in Turner, Maine (the "Truck Stop"). Upon arriving at the Truck Stop, Paquette observed a damaged soda machine and a pile of swept-up debris. He spoke with a Truck Stop clerk and called ATF Special Agent Durkin to the scene. Upon his arrival, Durkin observed that the soda machine next to the office had been blown

---

[1] At hearing, the defendant and his parents, Wanda and Craig Poland ("Mr. and Mrs. Poland"), testified in his behalf, telling a story markedly different in material respects from that of the government's two witnesses, Maine State Police ("MSP") Trooper Eric Paquette and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Christopher Durkin. This case is particularly disturbing because I am satisfied that both the defendant and his parents in some respects lied under oath. During cross-examination, counsel for the government elicited that (i) the family had twice before accused authorities of coercing the defendant to make a false confession, in 2001 in connection with an investigation by Marden's and in 2003 in connection with a charge against the defendant of theft of a vehicle, and (ii) prior to the defendant's April 2005 conviction for theft, his family told police he had a medical condition that caused him to make false confessions although, in fact, he has no such condition. Sadly, the testimony given before me by both the defendant and his parents regarding events that transpired at the Poland residence in Turner, Maine on April 3, 2004 fits this mold. The defendant testified, in essence, that he falsely confessed, and he and his parents painted a portrait of police misconduct. Among other things, (i) both the defendant and his mother testified that each of them asked that she be present during an interview in Durkin's vehicle and that Paquette rebuffed those requests, (ii) the defendant testified that he both saw and heard the doors lock after he entered the vehicle, and his mother testified that she heard the doors lock while standing on her porch (approximately seventy-five feet away), (iii) both parents testified that Mr. Poland asked to see his son during the interview in the vehicle, and Paquette refused, (iv) the defendant and his parents testified that after the interview in the vehicle ended, Durkin directed the defendant to sit outdoors on a stone wall in his t-shirt on that cold April day, (v) the defendant and his mother testified that when the defendant came into the garage and asked Durkin whether he could come in because he was cold, Durkin agreed but directed him to stay put in the garage, whereupon the defendant sat on a wood pile there, and (vi) the defendant's parents testified that Durkin entered the family's home (with Mr. and Mrs. Poland following behind him) despite Mr. Poland's explicit refusal to consent to the search. Specifically, Mr. Poland testified that after he refused consent to search his son's bedroom and the family's computer, Durkin told him officers had the right to enter because there was probable cause, or words to that effect. Mr. Poland testified that he asked, "Don't you need a warrant?" – to which Durkin allegedly responded that with probable cause he could "more or less go in there and turn this place upside down." Paquette and Durkin, whom I found to be credible witnesses, disputed all of the foregoing. Beyond this, the testimony of the defendant and his parents in certain respects strains credulity. For example, Durkin and Paquette testified that they did not lock the doors while the defendant was sitting inside the vehicle, and the defendant himself acknowledged that he did not observe either officer doing so. Durkin testified that the doors do lock automatically when the car is placed in drive but that he did not believe he would have placed it in drive on that occasion. This makes perfect sense: The vehicle was sitting in one spot in the driveway at all relevant times. Durkin and Paquette both flatly denied having instructed the defendant to sit on the stone wall, and it is implausible that they would have done so. Prior to entering the home, Paquette had asked the defendant's permission to look at his computer. It is much more likely that, as Paquette testified, the defendant entered the home at the same time he did and showed him to the computer. Finally, it strains credulity that Durkin searched the home in the face of the defendant's father's express refusal. Durkin's testimony indicated that he was well aware that he would have needed to obtain a search warrant in the circumstances. Such brazen conduct on his part would have jeopardized the investigation, if not his career. In addition, Durkin credibly testified that, as a matter of practice, he keeps people in front of him, and walks behind them, when he is walking through an unfamiliar residence. The story of Durkin entering the home, with the family following behind, does not hold water.

outward. Metal was twisted, and debris lay at the bottom of the machine. He took custody of debris that appeared to be the remnants of a pipe bomb, otherwise known as an improvised explosive device or IED.

A separate incident on Saturday, April 3, 2004, brought the defendant to Paquette's attention. That day Paquette received a call from a local farmer, Clay McCafferty. McCafferty complained that he had learned from the local Paris Farmers' Union ("PFU") that someone had tried to buy a fertilizer, ammonium nitrate, purportedly for use on McCafferty's farm. McCafferty told Paquette the representation had been false: He did not use ammonium nitrate and had not authorized anyone to purchase it for him.

Paquette called Durkin and arranged to meet him later that morning in the parking lot of the PFU. At approximately 11 a.m. Paquette, who was wearing his MSP uniform and driving a marked cruiser, arrived at the PFU parking lot. Shortly thereafter, a plainclothed Durkin drove his Chevrolet Suburban ("Suburban") with tinted windows into the PFU lot. The two officers entered the PFU and proceeded to question a store clerk and supervisor. The clerk said that on March 31, 2004 an individual whom he knew as Jonathan Poland had come into the store and inquired about purchasing ammonium nitrate. According to the store clerk, Poland was specifically looking for a fertilizer with a high first number and low second number, which Poland said he wanted to use on the McCafferty property. The store clerk said that Poland had inquired about purchasing twenty-five pounds but said he could use fifty pounds.[2] Paquette, who was unfamiliar with Jonathan Poland, obtained directions to the Poland residence, which was located at 57 Fourwheel Drive in Turner.

At about noon Paquette drove his marked cruiser to the Poland residence, which sits atop a hill

---

[2] At some point – it is not clear whether before or after April 3, 2004 – Durkin learned from an ATF explosives expert that fifty pounds
*(continued on next page)*

at the end of a long, steep driveway. Durkin followed behind in the Suburban. Paquette pulled his cruiser up near the unenclosed front porch of the Poland home, approximately twenty-five to thirty feet from the house. Durkin parked his Suburban alongside a stone wall across from, and approximately seventy-five feet away from, the house. Mrs. Poland observed the officers pulling into the driveway and walked out onto the porch to meet them. They identified themselves to her and asked to speak with Jonathan Poland. She told the defendant, who was working on an unfinished room over the family's garage, that officers wanted to speak with him. The defendant, who at that time was an 18-year-old high-school student, joined them on the porch.

Paquette and Durkin identified themselves to the defendant. Paquette's firearm was holstered but visible; Durkin wore a firearm, but it was not visible. Paquette said the officers wished to speak to him about a complaint that he had attempted to buy ammonium nitrate at the PFU. The defendant said that he had tried to buy the fertilizer to use on his father's lawn. Shortly after the officers began conversing with the defendant, Durkin asked if he would mind if they continued the conversation in the Suburban. Snow was still on the ground, and it was a cold, overcast, misty day. While Durkin could have asked permission to speak to the defendant inside his home, he preferred to speak with him in his vehicle because it had been his experience that people's homes contained distractions such as dogs, television sets and children and because he wanted to speak to the defendant, whom he had ascertained was an adult, alone. The defendant agreed and accompanied the officers to the Suburban. Durkin opened the front passenger door and cleared some belongings from the seat, after which the defendant got in the front passenger seat. Neither officer placed the defendant into the vehicle or laid a hand on him. Paquette got into the rear passenger seat behind the defendant, and Durkin slid into the driver's

---

of ammonium nitrate is the equivalent of twenty to twenty-five pounds of TNT or dynamite.

seat and started the engine running. Neither Paquette nor Durkin locked the vehicle's doors. Nor did the doors lock automatically.[3] The Suburban's windows were tinted, making it difficult to see into the Suburban but posing no difficulty in seeing out.

The interview in the Suburban lasted a total of approximately thirty minutes. About fifteen minutes after it began, Mr. Poland arrived home from work. Mrs. Poland came out to greet him, and he asked her what was going on. Mrs. Poland informed him that officers were talking to their son in the Suburban. He turned to walk toward the Suburban, and Paquette got out and met him about halfway. Mr. Poland asked Paquette what was happening. Paquette advised him of the McCafferty complaint and his son's response that he was attempting to purchaser fertilizer for the Polands' lawn. Paquette asked whether Mr. Poland knew of any plans by his son to use fertilizer on the lawn. Mr. Poland said he had no knowledge of such plans and no use for fertilizer on his lawn and that, in any event, his son had no money to buy fertilizer. Paquette also asked whether Mr. Poland had heard of the Truck Stop incident. Mr. Poland said that he had. Paquette rejoined Durkin and the defendant in the Suburban. He then confronted the defendant with his father's comments concerning the fertilizer, saying words to the effect that this was a serious matter and the defendant needed to be truthful. The defendant maintained that he was telling the truth.

At no point during the interview in the Suburban did Durkin or Paquette read the defendant warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Neither officer advised the defendant that he was free to leave or that he was required to stay. The defendant did not attempt to leave the vehicle during the interview. Both officers asked him a number of questions, including whether he had any involvement in a recent spate of bomb threats at the local high school, whether he had any

---

[3] Neither Durkin nor Paquette recalled whether the doors locked automatically; however, Durkin testified (reasonably and credibly)
*(continued on next page)*

involvement in the Truck Stop incident, whether he had ever made a bomb and whether he knew of anyone who had ever made a bomb. The defendant answered "no" to all of these questions. He said that on the evening of March 19, 2004 he had been with friends and family at Max's Grill in Auburn. Paquette stated that he was very concerned about the fact that the defendant, a high-school student, was trying to buy ammonium nitrate during a time when there had been six bomb threats at the high school. Toward the end of the interview, Paquette asked the defendant whether he had ever read materials on bomb making, and the defendant said that he had. He told the officers he had viewed a publication online called the Anarchists' Cookbook. Paquette then asked if he could view this publication on the defendant's computer, and the defendant said that he could. The two officers and the defendant got out of the Suburban and approached the house. Mr. Poland met them on the porch.

Durkin asked Mr. Poland, as had Paquette, whether he had wanted ammonium nitrate for lawn fertilizer and whether he had heard about the Truck Stop explosion. Mr. Poland told Durkin that his son had no money to purchase fertilizer and that he, Mr. Poland, had not asked him to purchase any. Mr. Poland also said that (i) he had heard about the explosion, (ii) he had asked his son if he knew anything about it, and (iii) his son had denied it. Durkin told Mr. Poland he wanted to look at areas in the house to which the defendant had access, in particular the family computer and the defendant's bedroom. He emphasized to Mr. Poland that the Truck Stop explosion was a serious incident, and someone could get hurt. Mr. Poland agreed to the request and led the officers into the house.

The defendant showed Paquette to the computer, which was located off of a mudroom near the front porch. The defendant started up the computer and entered a password. Meanwhile, Mr. Poland led Durkin down a hallway to the defendant's bedroom. As Durkin began to search the bedroom, the

---

that the doors do so if the vehicle is placed in drive and that he did not believe that he would have placed it in drive on that occasion.

defendant walked down the hall to observe that search. Paquette waited alone for the computer to finish logging on. He looked at a bookshelf on his left and spotted a piece of black iron pipe similar in appearance to the pipe-bomb remnants found at the Truck Stop. He called out for Durkin. Durkin joined Paquette, as did the defendant and Mr. and Mrs. Poland. Paquette handed Durkin the pipe.

Durkin examined the object, which he recognized as an end cap of the sort that typically is placed on the ends of a pipe in making a pipe bomb and which was consistent in appearance with the fragments found at the Truck Stop. He asked the defendant what it was, where it came from and whether it was his. The defendant said it was part of the house's boiler and it might have been his father's, a statement that his father immediately denied. Both Mr. and Mrs. Poland began to encourage the defendant to be honest. The defendant began to cry. He then confessed that on March 19, 2004 he and a cousin had obtained materials to make pipe bombs at a Home Depot in Auburn and made two pipe bombs in his cousin's car in the parking lot of a closed Wal-Mart in Auburn. He said that he and his cousin went out for dinner at Max's Grill in Auburn and then drove to Plains Road in Turner, where they detonated the first pipe bomb in a field. He stated that they then drove to the Truck Stop, where the defendant's cousin placed the second bomb in the soda machine and lit the fuse. The defendant's cousin had then driven him home. Officers asked the defendant to make a written statement, and he did so. *See* Gov't Exh. 2. He also provided Paquette directions to the field where he said the first bomb had been detonated. The officers departed the Poland home approximately an hour after they had first arrived. Paquette later searched the field and recovered fragments and duct tape that he turned over to Durkin.

## II. Discussion

The defendant seeks suppression of statements he made on April 3, 2004 on grounds that (i) he was subjected to custodial interrogation without benefit of required *Miranda* warnings, (ii) his

statements were not knowingly, intelligently and voluntarily made, and (iii) his statements were the fruit of an illegal search and seizure. *See generally* Motion To Suppress Statements. He seeks suppression of evidence seized that day on grounds that (i) no voluntary, intelligent and knowing consent was given to the search, (ii) to the extent Mr. Poland gave consent to search his son's room and computer, he lacked authority to do so, (iii) no exigent circumstances justified the search, and (iv) the search was the fruit of the unlawfully obtained confession. *See generally* Motion To Suppress Evidence. The government bears the burden of proving (i) *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), (ii) the voluntariness of a confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990), and (iii) the lawfulness of warrantless searches and seizures, *see, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992). For the reasons that follow, I find that the government meets its burden of demonstrating the lawfulness of the officers' conduct with respect to both statements made and tangible evidence seized.[4] The defendant's "fruit of the poisonous tree" arguments necessarily also therefore fail. *See, e.g., United States v. Santana*, 895 F.2d 850, 854 (1st Cir. 1990) ("Because the search and seizure did not violate Tejada's rights under the Fourth Amendment, there is no force to Tejada's further argument that his post-arrest statements should have been suppressed as 'fruits of the poisonous tree' [i.e., as derivative of the prior allegedly illegal search and seizure].").

### A. Statements

#### 1. Asserted *Miranda* Violation

Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to

---

[4] The government relies on consent, rather than exigent circumstances, to legitimate the warrantless searches and seizures of April 3,
*(continued on next page)*

the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79. The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted). Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id*. (citation omitted).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id*. at 323. *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted). "Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

Questioning of a suspect in a police vehicle does not automatically render a suspect "in custody." *See, e.g., United States v. Speal*, No. 97-3344, 1998 WL 886757, at *5 (10th Cir. Dec. 21, 1998); *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996). Rather, courts have considered, *inter alia*, such factors as whether the car was unmarked, unlocked or stationary, whether the suspect

---

2004. *See* Government's Objection to Defendant's Motions To Suppress, etc. ("Objection") (Docket No. 36) at 5-7.

was physically restrained, whether the police car was located in a public or familiar (versus isolated) setting, the length and tone of the interview and the number of officers conducting it. *See, e.g., Speal*, 1998 WL 886757, at *5 (suspect not "in custody" during pre-*Miranda* detention in patrol car following traffic stop when (i) there was no evidence of coercion by officer, (ii) conversation took place in front seat of patrol car on shoulder of public highway during day, (iii) conversation was not excessive in length, (iv) suspect was not handcuffed and within eyesight of his companion, whom he had witnessed being questioned and released, and (v) windy, chilly conditions justified relocation); *United States v. McKinney*, 88 F.3d 551, 553-55 (8th Cir. 1996), *overruled on other grounds by United States v. LeBrun*, 363 F.3d 715 (8th Cir. 2004) (suspect not "in custody" when he was questioned for brief period in backseat of sheriff's car outside his home, he was not handcuffed, there was no evidence he was unable to open car doors, he did not invite officers into his home upon arrival despite rain, and he willingly sat in sheriff's car); *United States v. Rainbow*, 380 F. Supp.2d 1071, 1078-79 (D.N.D. 2005) (18-year-old suspect not "in custody" during questioning in unmarked sport utility vehicle parked in his driveway when (i) he was informed at outset he was not in custody or under arrest, would not be arrested and could terminate interview at any time, (ii) he was not handcuffed, escorted or placed into vehicle but rather walked out of his home without restraint and got into it, (iii) doors to vehicle were unlocked and (iv) interview was cordial and voluntary).

In this case, I conclude that the defendant was not "in custody" while being questioned by officers in Durkin's vehicle or at any other point during the officers' visit of April 3, 2004. Neither officer directed that the defendant enter the vehicle; rather, Durkin asked the defendant if he would mind continuing the interview in his vehicle, and the defendant accompanied the officers there. Neither officer told the defendant he was not free to leave. Neither officer handcuffed the defendant, placed him in the vehicle or in any other respect physically restrained him. The doors were unlocked.

The vehicle was unmarked. Although the windows were tinted, those inside the vehicle had an unobstructed view. The Suburban was parked in the driveway of the defendant's home, and at various points both of his parents were within his view. The defendant was questioned by two officers, one in full uniform with holstered weapon. However, the interview was relatively brief (lasting no more than half an hour), and there is no evidence the officers adopted a belligerent tone. Finally, although the defendant was young – an 18-year-old high-school student – he was (as officers ascertained prior to questioning him) an adult, and he had had previous experience with law enforcement, having been charged with theft of a car.

Two cases cited by the defendant (one in his brief and one at hearing) in support of his argument that he should be found to have been "in custody" are materially distinguishable. *See* Memorandum of Law in Support of Jonathan Poland's Motions To Suppress ("Defendant's Memorandum"), attached to Motion To Suppress Statements, at 4 (citing *United States v. Hanson*, 237 F.3d 961, 964-65 (8th Cir. 2001), *overruled on other grounds by LeBrun*). In *Hanson*, agents appeared at a suspect's door eight months after an arson attempt, awakened him and asked him to accompany them to a field station to view photographs. *See Hanson*, 237 F.3d at 965. He was transported to an isolated office at the field station in the locked back seat of a government truck. *See id*. Once there, he was told that he was not under arrest and was free to leave; however, he was dependent upon agents for a ride home and remained with them for three hours. *See id*. In this case, by contrast, the defendant was questioned for approximately a half hour in a parked, unmarked, unlocked car during daylight hours in the driveway of his own home.

In the other case cited by the defendant, *Yarborough v. Alvarado*, 541 U.S. 652 (2004), the Supreme Court observed that "fairminded jurists could disagree" over whether a 17-year-old suspect was "in custody" in circumstances in which (i) his parents, in response to a police request to speak

11

with him, brought him to a police station, (ii) his parents asked to be present during the interview but were rebuffed, and (iii) he was interviewed in a small room at the station for approximately two hours. *Yarborough*, 541 U.S. at 656, 664. After listing factors cutting against a finding of custody, the Supreme Court detailed those weighing in favor of such a finding:

> Comstock interviewed Alvarado at the police station. The interview lasted two hours, four times longer than the 30-minute interview in [*Oregon v.*] *Mathiason* [429 U.S. 492 (1977)]. Unlike the officer in *Mathiason*, Comstock did not tell Alvarado that he was free to leave. Alvarado was brought to the police station by his legal guardians rather than arriving on his own accord, making the extent of his control over his presence unclear. Counsel for Alvarado alleged that Alvarado's parents asked to be present at the interview but were rebuffed, a fact that – if known to Alvarado – might reasonably have led someone in Alvarado's position to feel more restricted than otherwise.

*Id*. at 665. In this case, significantly, the defendant was an adult and agreed on his own to accompany officers to the Suburban. He was not interviewed at a police station but, rather, in an unmarked police vehicle parked in the driveway of his home. The interview lasted approximately thirty minutes, not two hours. Finally, for reasons discussed above, I do not find credible the testimony of the defendant and/or one or both of his parents that (i) Mrs. Poland asked to accompany the defendant to the Suburban and was rebuffed, (ii) Mr. Poland asked to see his son in the Suburban and was rebuffed, or (ii) following the interview in the Suburban, Durkin directed the defendant to sit on a stone wall and, later, on a wood pile in the garage.

For the foregoing reasons, I conclude that the government has met its burden of showing that the dictates of *Miranda* were not transgressed inasmuch as the defendant was not "in custody" during questioning by Paquette and/or Durkin on April 3, 2004.

### 2. Voluntariness of Confession

The defendant next posits that his confession was the product of coercive questioning and, hence, involuntary. *See* Defendant's Memorandum at 4. Involuntary confessions violate the due-

process clauses of the Fifth and Fourteenth amendments. *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

I am persuaded that, in this case, the defendant's confession was not the result of abusive police practices. The defendant suggests that his youth, combined with the persistence and location of the questioning and the officers' failure to give him *Miranda* warnings, contributed to the coercive atmosphere that overbore his will. *See* Defendant's Memorandum at 4. While it is true that the defendant was a young adult (only 18), he was not unsophisticated in matters of law enforcement: He had previously been charged with theft of a car, and he and his parents previously had twice alleged that he made coerced confessions to authorities. The defendant voluntarily accompanied the officers to the Suburban. He was asked a number of pointed questions, but was not coerced or tricked, while inside the vehicle. The interview lasted no more than thirty minutes. When Durkin later questioned the defendant inside the family's home about the pipe cap, and the defendant gave a response that his father denied, the defendant's parents exhorted him to tell the truth. At that point, the defendant became emotional and confessed.

In short, the circumstances in totality weigh in favor of a conclusion that officers did not involuntarily extract the defendant's confession by means of coercive or abusive police practices.

13

### B.  Tangible Evidence

### 1.  Mr. Poland's Authority To Consent to Search

The defendant concedes that, even without a warrant or probable cause, government agents may conduct a search based on an individual's voluntary consent.  *See* Defendant's Memorandum at 5.  However, he argues as a threshold matter that his father lacked authority to consent to a search of his room and computer.  *See id*. at 5-6.  As the government points out, *see* Objection at 6, "[t]he consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared[,]" *United States v. Matlock*, 415 U.S. 164, 170 (1974).

The government can meet its burden of showing the validity of a co-tenant's consent by demonstrating "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."  *United States v. Jiménez*, 419 F.3d 34, 40 (1st Cir. 2005) (citation and internal quotation marks omitted).  Alternatively, the existence of certain co-tenant relationships – husband-wife or parent-child – raises a rebuttable presumption of mutual use of property by persons generally having joint access or control for most purposes.  *See, e.g., United States v. Rith*, 164 F.3d 1323, 1330 (10th Cir. 1999); *United States v. DiPrima*, 472 F.2d 550, 551 (1st Cir. 1973) ("[E]ven if a minor child, living in the bosom of a family, may think of a room as 'his,' the overall dominance will be in his parents.").  This presumption has been extended to adult children, at least in circumstances in which such children live in at a parental home without paying rent or are merely occasional guests there.  *See, e.g., Rith*, 164 F.3d at 1331 ("The government has . . . shown that

Rith lived with his parents and was not paying rent. Although Rith was eighteen years old, these facts raise a presumption of control for most purposes by Rith's parents over the entire home and thus they could have accessed Rith's room without his consent. There is no evidence to rebut this presumption: no lock on Rith's bedroom door; no agreement with Rith's parents that they not enter his room without his consent; no payment of rent."); *United States v. Corley*, 342 F. Supp.2d 776, 780 (N.D. Ind. 2004) ("As an adult child who 'sometimes slept in the basement of' his mother's house, Defendant's familial relationship with Ms. Wilson gives rise to a rebuttable presumption that Ms. Wilson had control over her entire property for most purposes."); *United States v. Anderson*, 42 F. Supp.2d 713, 724 (E.D. Mich. 1999) (mother of adult defendant had presumptive authority to consent to search of his room when defendant lived with her for greater part of week and did not pay rent, although he did pay bills).

In April 2004 the defendant was an 18-year-old high-school student who lived with his parents. One can draw a reasonable inference that he paid no rent; Mr. Poland told officers that his son had no money to buy fertilizer. Mr. Poland therefore had presumptive authority to consent to a search of his son's room and property within the family home. With respect to the defendant's bedroom and the computer and its surrounding area, the presumption stands unrebutted. There is no evidence that the defendant excluded his parents from access to his bedroom by means of a lock or a shared understanding. The computer was described by both the defendant and Mr. Poland as the "family computer," and it was located in a common area off of a mudroom. The defendant testified that it could not be accessed except by a password; however, there was no evidence that Mr. Poland was denied access to that password.

In any event, as the government points out, the defendant's own behavior demonstrated his actual consent to the search. *See* Objection at 6-7. The defendant gave Paquette express consent to search the computer and assisted him in logging on. In addition, the defendant was present on the

15

porch when his father gave consent to a request to search that encompassed his bedroom. The defendant later walked down the hallway to observe the search of that room. At no point did he raise a contemporaneous objection to that search. In such circumstances the First Circuit has been unreceptive to a later challenge to the validity of a parent's consent. *See, e.g., DiPrima*, 472 F.2d at 551.

The government carries its burden of demonstrating that Mr. Poland had authority to consent to a search of his son's bedroom and the family's computer.

### 2. Voluntariness of Mr. Poland's Consent To Search

The defendant finally argues that even assuming *arguendo* Mr. Poland had authority to consent to a search of his room and effects, any such consent was not given voluntarily. *See* Defendant's Memorandum at 6. "Valid consent renders a warrantless search constitutionally permissible, and while consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it." *United States v. Perez-Montañez*, 202 F.3d 434, 438 (1st Cir. 2000). "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." *Id*. (citation and internal quotation marks omitted).[5] "The district court's conclusion as to whether consent was freely given must take into account the totality of the circumstances surrounding the interaction between the defendant and the authorities." *Id*. This interaction, in turn, is measured by a standard of "objective reasonableness –

---

[5] While the question sometimes is framed as one of whether consent has been "freely and voluntarily" given, the concepts are equivalent. *See, e.g., United States v. Drayton*, 536 U.S. 194, 206 (2002) ("We turn now from the question whether respondents were seized to whether they were subjected to an unreasonable search, *i.e.,* whether their consent to the suspicionless search was involuntary."); *United States v. Chhien*, 266 F.3d 1, 7 (1st Cir. 2001) ("Consent is voluntary if it is the product of an essentially free and unconstrained choice.") (citation and internal quotation marks omitted).

what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999) (citations and internal quotation marks omitted).

In this case I have no difficulty concluding, on the facts as I have proposed they be found, that Mr. Poland voluntarily consented to the search that transpired at his home. Paquette and Durkin made clear to Mr. Poland that they were investigating (i) the report that his son had attempted to purchase fertilizer at the PFU and (ii) the Truck Stop incident. Mr. Poland was familiar with the latter incident; in fact, he told Durkin that he himself had queried his son whether he had any involvement with it, which his son denied. Durkin emphasized to Mr. Poland the seriousness of the investigation, pointing out that someone could get hurt. Mr. Poland then permitted the search. As his son was assisting Paquette to access the family computer, Mr. Poland led Durkin down the hallway to his son's bedroom and stood by as Durkin commenced a search. In short, while Mr. Poland later may have come to regret his cooperativeness, he voluntarily agreed to permit the searches that transpired in his home on April 3, 2004.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the defendant's motions to suppress evidence and statements be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de</u> <u>novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the*

*objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 19th day of January, 2006.

<u>/s/ David M. Cohen</u>
David M. Cohen
United States Magistrate Judge
